UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | Case No. 1:21-cr-621 (CRC) |
| v. | : | |
| | : | |
| **JULIA SIZER,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Julia Sizer ("Sizer") to 60 days' home detention, three years' probation, 60 hours of community service, and $500 in restitution.

I.   **Introduction**

The defendant, Julia Sizer, a nail salon owner from Western Pennsylvania, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Sizer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. A 60-day term of home detention and a 36-month term of probation is appropriate based on an assessment of relevant sentencing factors. As Sizer entered the Capitol Building, she recorded video on her cellphone depicting scores of rioters that had overwhelmed law enforcement on the Capitol's West Side and a tightly packed crowd of rioters

with whom she passed through the Parliamentarian Door while alarms blared overhead. Sizer later shared this video with others via private message, though she did not post it publicly on social media. To Sizer's credit, she remained inside the Capitol for less than three minutes. But when initially contacted by FBI and asked whether she entered the Capitol on January 6, she falsely stated that she did not. Sizer later sat for a voluntary interview wherein she admitted her conduct, and she has otherwise been cooperative with law enforcement.

Although Sizer stands before this Court on a misdemeanor conviction and her conduct was on the lower end of the spectrum of criminality on January 6, her actions—like those of scores of other defendants—took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for Sizer's actions, alongside so many others, the riot likely would have failed.

**II.    Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. (*See* Dkt. 18 (Statement of Offense), at 1-5.) As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Julia Sizer's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Julia Sizer traveled with her husband from her home in western Pennsylvania to Washington, D.C. to attend the "Stop the Steal" rally. On January 6, Sizer and her husband, along with Sizer's parents who traveled separately to Washington, D.C., listened to speeches, including that of the former President. She and her husband then followed the crowd

from the Washington Monument area toward the U.S. Capitol. At some point, she lost track of her parents. Sizer saw rioters scaling the walls of the Capitol building and told her husband that she wanted to go inside the building. At the time, she knew that former Vice President Pence was inside the building and that the Certification of the 2020 Presidential Election was taking place.

Sizer made her way to the Upper West Terrace of the Capitol Building, passing through throngs of other rioters along the way. There, she snapped selfies with her husband and took pictures of the crowd:






In photos and videos taken from Sizer's cellphone, a packed crowd is visible both on the Upper West Terrace and on the Capitol grounds below. The videos reflect the cacophony of the crowd on the Upper West Terrace, many members of which can be heard yelling and screaming. (*See* Exhibits 2, 3.)[1] Open-source video, available on ProPublica.org, also shows the density and the fervor of the crowd on the Upper West Terrace at the time that Sizer was present there.[2]

At approximately 2:42 p.m., a rioter wielding a crowbar broke open an exterior door of the Capitol building, known as the Parliamentarian Door.[3] The Parliamentarian Door is located on the Senate Side of the Upper West Terrace, near the Senate Wing Door, and close to where Sizer was taking pictures with her cell phone. The Parliamentarian Door is shown in the photo below, taken from Sizer's cell phone before she entered the Capitol.

---

[1]   Video exhibits have been submitted to the Court via USAfx.

[2]   *Available at* https://projects.propublica.org/parler-capitol-videos/?id=CPeuy7lOW44J. Videos in this collection, titled "What Parler Saw During the Attack on the Capitol," are tagged by location (e.g., "Near Capitol,") and timestamped. This video, timestamped at 2:41 p.m., shows the crowd on the Upper West Terrace, including rioters who had climbed onto window-washing scaffolding, and shows rioters rushing toward and through the Parliamentarian Door after it was broken open.

[3]   Visible in open-source video, a*vailable at* https://twitter.com/LisaBennatan/status/1346920295697952771. The damage to the door can be seen from the inside in CCTV. (*See* Exhibit 1.)
    The government does not have any direct evidence that Sizer witnessed another rioter break open the Parliamentarian Door with a crowbar, and Sizer has claimed that she did not see this occur. However, given the chaotic energy of the crowd around her and Sizer's proximity to the door when it was breached, it does not seem credible that Sizer wasn't at least peripherally aware of rioters attempting to break and in fact breaking into the Capitol building.



Sizer entered the Capitol building through the Parliamentarian Door at approximately 2:48 p.m. Sizer video-recorded her entry into the building on her cell phone. (*See* Exhibit 3.) A loud, high-pitched continuous beeping, similar to a smoke alarm, can be heard as Sizer approaches and passes through the Parliamentarian Door. As seen in CCTV, (*see* Exhibit 1,) Sizer travels a short distance into the building, recording as she goes.





Sizer appears to get stuck in a bottleneck as the crowd pushes in multiple directions. After the crowd loosens a bit, Sizer is able to make her way back out the Parliamentarian Door at approximately 2:50 p.m.

Sizer sent the video that she recorded of her entry into the Capitol building via private message to approximately six people.[4] She did not post the video publicly.

*Sizer's Interview*

When initially contacted by FBI and asked whether she entered the Capitol on January 6, Sizer falsely stated that she did not enter the Capitol building. Sizer later sat for a voluntary interview prior to her arrest in which she admitted to entering the Capitol on January 6 and apologized for lying to the FBI. When asked why she lied to the FBI, she stated that she panicked. Sizer described herself as being very conservative but not an activist. Sizer stated that she did not realize how serious the events at the Capitol were until watching the news later, and she thought that law enforcement had allowed protesters to enter the Capitol building. After watching the

---

[4]     In her voluntary interview, Sizer claimed to have sent the video to "maybe 6 people." The government was not able to determine exactly to whom Sizer sent the video.

news, Sizer said she felt sick to her stomach and wished she had not gone inside the building. Sizer admitted that, on January 6, she knew that Vice President Pence was inside the Capitol building and that the Certification of the 2020 Presidential Election was taking place. Sizer admitted to deleting some photos and/or videos of the Washington Monument after being contacted by FBI, but she denied deleting any pictures or video at the Capitol to get rid of evidence. Sizer stated that she did not mean to break any laws. Sizer apologized for her conduct and for lying to the FBI.

*The Charges and Plea Agreement*

On August 25, 2021, Julia Sizer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Sizer was arrested following her self-surrender to the FBI on September 2, 2021. On October 7, 2021, Sizer was charged by four-count Information with violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 4, 2021, Sizer pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, and Demonstrating in the Capitol Building. By plea agreement, Sizer agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of home detention followed by probation.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were

committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The defendant's lack of violence and property destruction explains why she was charged only with, and permitted to plead to, a misdemeanor rather than felony.

In this case, Sizer briefly entered the Capitol building shoulder to shoulder with dozens of other rioters. As is visible in the video that she recorded, she had progressed past thousands of others to reach the Upper West Terrace, and eventually the Parliamentarian Door, which had been broken open about six minutes earlier by another rioter with a crowbar. The fact that she was

sufficiently excited to record the moment that she entered the Capitol demonstrates that her conduct was not accidental or mistaken. Sizer intentionally crossed the threshold of the Capitol building, and she did so amid a blare of alarms and after disregarding multiple signals that doing so was wrong.

Further, in her interview with FBI, Sizer stated that she wanted to go inside the Capitol building and that she suggested doing so to her husband as they approached. She further admitted that she knew that Vice President Pence was inside the Capitol that day and that the certification of the 2020 Electoral College Vote was taking place. Sizer's claim that she believed that law enforcement was allowing rioters into the building is not credible given what she almost certainly saw and heard—rioters scaling the walls of the building, alarms blaring, and broken glass underfoot. Finally, though she voluntarily interviewed with the FBI prior to her arrest and admitted her conduct, she initially lied when the FBI first contacted her and asked whether she entered the Capitol building on January 6. This falsehood is aggravating and distinguishes Sizer from defendants who were immediately and completely forthcoming regarding their involvement in the Capitol breach.

That being said, Sizer was inside the Capitol building for only about two minutes, and she barely made it past the building's threshold because of the press of the crowd. The entirety of Sizer's entry into the Capitol is captured on CCTV and there is no evidence that she engaged in any violence or destruction of property during her very brief entry into the Capitol. Aside from her initial lack of candor when contacted by the FBI, Sizer has been cooperative with law enforcement and self-surrendered on the day of her arrest. And, unlike many other Capitol breach

defendants and subjects, Sizer appears to have maintained a low profile on social media.[5] Though she shared the video that she recorded with others, she did so via private message rather than publicly.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Julia Sizer has no criminal history. (Dkt. 24 ¶¶ 21-27.) She and her husband have three children, and Sizer owns and operates her own nail salon. (Dkt. 24 ¶¶ 33, 47.) She has been compliant with her conditions of pre-trial release. This factor supports a more lenient sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[5]  As noted in the PSR, Sizer previously had Instagram, Facebook, and Twitter accounts. Sizer's Twitter account has been inactive, and her Facebook and Instagram accounts were deactivated by those platforms. (Dkt. 24 ¶ 37.) Review of publicly visible content on Sizer's accounts before her arrest and before those accounts were deactivated did not reveal any relevant public posts before, during, or after January 6.

[6]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a


manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although Julia Sizer's conduct on January 6 was less egregious than many of her fellow rioters, her attitude toward approaching and entering the Capitol building was decidedly casual. She saw rioters scaling the walls, which clearly indicated that rioters were overrunning the building and gaining access improperly, yet Sizer told her husband she wanted to go into the Capitol. Despite the chaos around her, she made her way to the Upper West Terrace, took selfies, and smiled as the mob around her screamed and broke windows.  She recorded her entry into the Capitol building and shared it with others.  Her conduct demonstrates, at the very least, a failure to grasp the severity of the lawlessness and destruction happening around her.  This is further evidenced by her conduct in initially denying to the FBI that she entered the Capitol building.

That said, Sizer has been generally cooperative with law enforcement and accepted responsibility shortly after being arrested.  The government gives significant weight to Sizer's commitment, expressed through her attorney, to plead guilty and promptly resolve her case.  That she exited the Capitol building about two minutes after entering shows a recognition of

wrongdoing that many individuals lacked on January 6. And, unlike many others, she did not appear to use social media before or after the riot to inflame others or deny responsibility. The severity of the events and the need to generally deter what happened on January 6 favors a meaningful sentence, and it is important that Sizer understand that her decision to participate and breach the Capitol with thousands of others caused immense damage and risked lives. However, her culpability as compared with others involved is limited, which favors a more lenient sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[8] Indeed, the government invites

---

[7] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. *See, e.g., United States v. Hatley*, 1:21-cr-98) (TFH), Tr. 12/16/21 at 3 ("it's a good guideline for the Court to understand the variety of sentences that have been given [referencing the government's sentencing chart]") (statement of Judge Hogan).

[8] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging her with parading, picketing, or demonstrating on Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed on Andrew Hatley, 21-CR-98 (TFH), Jennifer Parks, 21-CR-363 (DLF), Esther Schwemmer, 21-CR-364 (DLF), and Eliel Rosa, 21-CR-68 (TNM) for reference. Each of these Capitol breach defendants, like Sizer, were inside the Capitol building for short periods of time, had no criminal history, and had little or no public social media presence regarding the riot. Given Sizer's minimal time inside the building, her culpable conduct on January 6 is on the lower end even amongst those defendants

17

for whom the government is recommending home detention.  However, as stated above, the government considers the fact that Sizer lied when initially contacted by the FBI an aggravating factor, and therefore recommends a 60-day period of home detention.  By way of comparison, Eliel Rosa's conduct on January 6 was more aggravating—he was inside the Capitol building for approximately 20 minutes and he traveled extensively throughout the building before leaving—but he voluntarily turned himself into the FBI three days after the riot, admitted he went into the Capitol, and expressed remorse for his conduct.  Likewise, co-defendants Schwemmer and Parks agreed to be interviewed by FBI shortly after the riot on January 17, 2021, and both admitted to entering the Capitol building.  Each of these defendants received probation sentences.  By contrast, defendants who lied to investigators or destroyed evidence have received lengthier sentences of home detention or incarceration.[9]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

---

[9] *See, e.g.*, Tutrow, Israel, 21-CR-310 (ABJ); Kostolsky, Jackson, 21-CR-197 (DLF); Rusyn, Michael, 21-CR-00303 (ABJ).

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Julia Sizer 60 days' home detention, three years' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: _____/s/_____
KATHRYN E. FIFIELD
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
555 4th St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048